566 F.Supp. 626 (1983)
Earl BRISSETTE, Plaintiff,
v.
Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant.
No. 82-1427C(B).
United States District Court, E.D. Missouri, E.D.
June 16, 1983.
*627 Robert J. Blackwell, St. Louis, Mo., for plaintiff.
Bruce D. White, Asst. U.S. Atty., St. Louis, Mo., for defendant.

MEMORANDUM
REGAN, District Judge.
This matter is before the Court upon the cross-motions of the parties for summary judgment. Fed.R.Civ.Pro. 56.
On September 21, 1973, plaintiff Earl L. Brissette filed an application for a period of disability and disability insurance benefits pursuant to 42 U.S.C. §§ 416(i) and 423. He alleged that he had been unable to work since July 7, 1972, due to injuries incurred as the result of a truck-automobile accident. His application was denied upon initial consideration, but approved upon reconsideration. A period of disability was established as of July 1972.
On July 15, 1981, the Social Security Administration determined that plaintiff's disability ceased as of June 1981, with the period of disability terminating on August 31, 1981. It was found that plaintiff was capable of returning to his past work. The decision to terminate plaintiff's benefits was affirmed upon reconsideration. On February 5, 1982, plaintiff appeared at a hearing held before an administrative law judge (ALJ) at which he testified and was represented by counsel. On March 4, 1982, the ALJ determined that plaintiff ceased to be disabled in June 1981 and that his entitlement to a period of disability and disability insurance benefits ended in August, 1981. On August 4, 1982, the Appeals Council affirmed the ALJ's decision. This then became the final decision of the defendant Secretary of Health and Human Services. On September 7, 1982, plaintiff filed his petition in this Court seeking judicial review of the defendant's decision. 42 U.S.C. § 405(g).
Plaintiff was born on July 12, 1941. He has a high school education. From June 1970 until July 1972, plaintiff worked as a truck driver. This was the last full time *628 job he held. His duties included driving a truck, loading and unloading traffic barricades, and servicing the barricades. The barricades weighed approximately 70 pounds and plaintiff would have to lift 200 of these each workday and carry them a distance of 20-50 feet. Previous jobs included work as a carburetor assembler from 1962 until 1970, a bellboy from 1967 until 1969, and a window assembler from 1961 until 1962.
At approximately 7:00 p.m. on September 3, 1973, at home plaintiff experienced pain in the left region of his back. His left leg gave way and he fell down striking his head and was momentarily unconscious. He was taken to St. Joseph Hospital in Kirkwood, Missouri, where he was examined. He was subsequently transferred to St. Joseph Hospital in St. Charles, Missouri, for continuing care. Upon evaluation at the St. Charles Hospital, diffuse tenderness was noted over the left lumbar spinal area. Straight leg raising was positive on both sides at 20°. Deep tendon reflexes at the knee were 2+ and equal on both sides. Deep tendon reflexes were present in plaintiff's right ankle, but absent in the left ankle. There was decreased sensation over the side of plaintiff's left foot. A chest x-ray revealed the existence of discoid atelectasis (airlessness of the lungs) of the right mid-lung. An electrocardiogram was within normal limits. A test for rheumatoid arthritis was negative. The sedementation rate of plaintiff's blood was 25 milliliters per hour, compared with the normal rate for men under the age of 50 of 0-10 milliliters per hour. A hematocrit test revealed that 48% of plaintiff's blood contained cells. Plaintiff's aspartate aminotransferase (SGOT) (an enzyme found in the blood) was 44 units, whereas normal is 0-33 units. Plaintiff was treated with bedrest and pelvic traction at 10 pounds on each leg. Plaintiff was also placed on an intermittent positive pressure breathing program. The discharge summary indicates that plaintiff "seemed to improve dramatically with hospitalization." Tr. 116.
A medical report dated March 12, 1974, from J.O. Lottes, M.D., board-certified orthopedic surgeon, indicates that he examined plaintiff on October 22, 1973.
Examination revealed that he moved and turned very poorly, and he was unable to walk on his heels and toes because of weakness in his left leg. There was atrophy of the left leg. Straight leg raising was tight but finally went to 90 degrees on the right and about 70 degrees on the left. There was diminished pinprick over the left leg, and tenderness over the entire spine from about the upper dorsal region to the sacrum. He sustained a back sprain superimposed on a pre-existing fracture of the lumbar vertebrae.
Tr. 126.
On October 24, 1973, plaintiff was admitted to Lutheran Hospital, St. Louis, Missouri, for evaluation of pain in his back. Plaintiff indicated that he felt discomfort in his back, both hips, and left leg. He explained that he had injured his back in July 1972 in a head-on collision and also injured his back on September 2, 1973. "Examination revealed a limitation of back motion and tenderness over the low back region and weakness of the left calf." Tr. 122. He had a lumbar myelogram. Dr. Lottes stated in his March 12, 1974 report that the myelogram revealed no defect other than an old compression fracture at the region of D-12. He was treated conservatively and discharged from the hospital on November 17, 1973, with a diagnosis of low back derangement.
Dr. Lottes examined plaintiff again on December 4, 1973, at which time plaintiff complained of pain in his back and stated that he had difficulty walking due to pain. He described the pain as "a `shock-like' pain starting in his neck and radiating down to his toes." Tr. 126. Dr. Lottes stated that he had "difficulty accounting for all of his complaints." Id. Dr. Lottes examined plaintiff again on January 29, 1974, at which time plaintiff still complained of pain in his back and stated that he had begun to walk with a cane. Dr. Lottes noted that plaintiff moved and turned very poorly. *629 Plaintiff had difficulty bending forward and could not walk on his heels and toes. Dr. Lottes concluded that "[i]t is difficult to examine and evaluate this patient as he cannot relax or he does not want to relax; however, I think he has some disability but not as much as he thinks." Tr. 127.
Plaintiff was hospitalized from November 9 to November 15, 1977, at Madison Memorial Hospital. The 17 pages of hospital records for this period which were presented to the Court are blank. Tr. 128-144.
On November 15, 1977, plaintiff was admitted to De Paul Hospital, St. Louis, Missouri. One week prior to his admission, plaintiff's head had jerked uncontrollably towards the right. Plaintiff then lost consciousness and fell out of his chair. An observer stated that plaintiff had a generalized seizure for about one minute, followed by a period of confusion and disorientation in which plaintiff's eyes stared blankly straight ahead and then closed for several hours. After the episode occurred, the hospital record indicates plaintiff "has felt somewhat uptight, and has had some mind memory impairment, but this has progressively improved." Tr. 146. Plaintiff also had tenderness and pain in the left occipital and parietal areas. It was noted that he was hospitalized at Madison Memorial Hospital in Fredrickton, Missouri. A brain scan at Madison Memorial Hospital indicated an "increased uptake in the left parietal region," which was believed to be a subdural hematoma (a blood clot beneath the outer membrane of the brain) or a scalp trauma. A skull x-ray performed at Madison Memorial Hospital was normal. A routine blood count indicated that plaintiff had a low platelet count of 10,000. Upon examination, tenderness was noted in plaintiff's left parietal scalp. Sensory testing was intact to pin, touch, temperature, position, and vibration. "Cerebellar function testing [was] normal in all four extremities with respect to speed and accuracy." Tr. 147. Plaintiff's gait was somewhat unsteady, but this was believed to be due to the fact that plaintiff had not been out of bed for one week. Plaintiff's deep tendon reflexes were normal on both sides, except for the absence of the left ankle jerk. On November 15, 1977, a C.T. brain scan revealed a "mass effect on the left with shift of the lateral ventricles toward the right, slight anterior medial displacement of the calcified choroid plexus on the left side." Tr. 148. It was stated that this was probably due to a subdural hematoma. Six days later, a repeat C.T. brain scan was performed, but no significant change was indicated. On November 23, 1977, an arteriogram revealed a subdural hematoma in the left temporal area, which measured 7-8 millimeters. Plaintiff underwent a splenectomy. Pathology of the spleen revealed that it was hyperplastic, with a diffuse infiltration of polymorphonuclear cells (cells having nuclei of varied forms), which suggested that the spleen was in an aseptic condition (a condition in which living organisms are absent). Plaintiff's platelet count began to increase following the removal of the spleen, but the count fell back to abnormally low levels. Plaintiff received a platelet transfusion. By December 6, 1977, plaintiff's platelet count had increased. On December 7, 1977, an excretory urogram was performed and revealed the existence of an obstructive uropathy on the right side. It was believed that this was due to either a small non-opaque calculus or a recently passed calculus. At the time of his discharge, December 15, 1977, plaintiff's platelet count was still low but had remained fairly consistent at approximately 52,000 to 60,000. He was discharged on a program of steroids. It was also recommended that he be seen regularly by other physicians for his neurological situation.
A medical report from Thomas F. Frawley, M.D., indicates that he initially treated plaintiff on November 15, 1977, and last saw plaintiff on September 8, 1980. Dr. Frawley diagnosed plaintiff as having idiopathic thrombocytopenia (a condition in which there are abnormally small numbers of platelets, of unknown origin), renal stones, and a convulsive disorder. Dr. Frawley indicated that plaintiff had good response to treatment. He stated that *630 plaintiff's platelet count in April 1978 was 285,000.
Plaintiff visited the emergency room at Madison Memorial Hospital several times from March 12, 1979 until August 4, 1981. On March 12, 1979, plaintiff was treated for his complaints of aching, nausea, vomiting, headache, and neck pain. He was prescribed medicine and was discharged in "good" condition. Tr. 164. On March 14, 1980, plaintiff was treated for an eye injury. While shooting a gun, it backfired and a pellet fragment went into his right eyelid. He was discharged in "good" condition. Tr. 161. On April 1, 1980, plaintiff was treated for a hand injury incurred as a result of an accident with a lawnmower blade. He was discharged in "good" condition. Tr. 160. On May 20, 1981, plaintiff was treated for a severe headache, and discharged in "fair" condition. Tr. 159. On July 3, 1981, plaintiff was treated with medication following his complaint of a headache on the left side of his head. At that time, it was suggested that he be admitted to the hospital, but plaintiff indicated that he did not want to and was not admitted to the hospital. On August 4, 1981, plaintiff received medication for a headache and eye pain.
A medical report from P. Beyer, D.O., indicates that on May 22, 1981, plaintiff complained of severe headaches on the left side. The physical examination revealed no abnormalities. He was treated with medicine for pain.
A medical report dated June 22, 1981, from Normandy Orthopedics, Inc., St. Louis, Missouri, indicates that Terry J. Weis, D.O., first examined plaintiff on June 17, 1981. At that time, plaintiff complained of a dull aching sharp lower back pain, which radiated to his left leg. It was noted that prescription medication appeared to alleviate his pain. Plaintiff could not walk on his toes on the left side, but could walk on his heels. Plaintiff could not squat. Plaintiff had no great difficulty moving on and off of the examination table. The range of motion of plaintiff's lumbar spine was 0-15° flexion, 5° extension, and 10° side bending. Straight leg raising was performed on both sides to 85°. Pinpricking in both lower extremities revealed no neurological deficit. Plaintiff's heel and knee reflexes were normal. Plaintiff had a good toe extensor strength. Dr. Weis noted that there was a moderate lower lumbar muscle spasm and tenderness on both sides. Tenderness was also noted over the L5-S1 level. An x-ray of plaintiff's lumbar spine revealed an old compression fracture at T-12. Degenerative changes were noted in the anterior portions of T-11, 12, L-1, with thinning of the L5-S1 interspace. Dr. Weis diagnosed plaintiff as having an old compression fracture, degenerative arthritis of the thoracic and lumbar spine, and chronic lumbar sacral sprain. Dr. Weis concluded that plaintiff "does have pathology within his low back which would be exacerbated by activity which would require heavy lifting, prolonged ambulation, bending, stooping, climbing or working at a height." Tr. 167.
A residual functional capacity report dated June 25, 1981, reveals that in a typical eight-hour workday plaintiff should be deemed capable of standing and walking for 6 to 8 hours and sitting for 8 hours. Plaintiff should be able to lift and carry 25 to 50 pounds frequently. Plaintiff should be able to squat, kneel, crouch, crawl, and climb stairs occasionally and reach above shoulder height frequently, but never bend. No restrictions were noted in the use of plaintiff's upper or lower extremities. Plaintiff was restricted to driving automotive equipment only short distances.
A medical report dated September 14, 1981 from James G. McClure, M.D., board-certified orthopedic surgeon, indicates that plaintiff complained to him of pain in his lower back, difficulty with his left leg, difficulty urinating at times, and headaches. Dr. McClure observed that plaintiff walked in a slow, halting manner. Plaintiff could stand on his tiptoes and heels. Plaintiff complained of pain in the midlumbar region upon bending forward 60°, bending backward to 10°, and bending laterally to 20°. Plaintiff complained of pain in his back and left lower extremity while squatting. Plaintiff could squat fully. Plaintiff's motor *631 function was intact. There was a moderate decrease in the left ankle jerk. There were two inches of atrophy in plaintiff's left calf, but there was no thigh atrophy. Straight leg raising to 90° on each side resulted in a pulling pain in plaintiff's lower back. Plaintiff complained of some minor pain in his left hip on full flexion. Plaintiff could get on and off the examining table without difficulty. An x-ray of plaintiff's lumbar spine revealed a healed compression fracture at T-12. He was diagnosed as having an old healed compression fracture, possible old ruptured lower lumbar disc with two inches of atrophy in plaintiff's left calf, nervousness, and postoperative splenectomy. Plaintiff was treated with heat to his back as needed, aspirin or Tylenol, and tranquilizers. Dr. McClure stated that plaintiff "is capable of a reasonable amount of standing, walking, stooping and bending and light lifting. It is going to be very difficult to get him back to work after 9 years of sitting." Tr. 171.
A residual functional capacity report dated September 17, 1981, reveals that in a typical eight-hour workday plaintiff should be deemed capable of standing and walking six hours and sitting eight hours. Plaintiff should be able to lift 25-50 pounds frequently. Plaintiff should be able to squat, kneel, crouch, crawl and climb stairs occasionally, reach above shoulder height frequently, but never bend. No restrictions were noted in the use of plaintiff's upper or lower extremities. Plaintiff was restricted to driving automotive equipment only short distances.
A medical report dated December 30, 1981 from Thomas G. Otto, M.D., board-certified orthopedic surgeon, indicates he examined plaintiff on the same date. Plaintiff complained of constant pain in his back and left leg. Dr. Otto noted that plaintiff walked with a severe limp and used a cane for support. Plaintiff could not use his left leg freely. Plaintiff was unable to stand, stoop, or flex his lumbar spine. Plaintiff could not bend freely to his side. Plaintiff had a two inch atrophy in his left calf muscle as compared to the right. Plaintiff had a one inch atrophy in his left thigh muscle. Plaintiff had a weakness in his left gastrocnemius (a muscle in the calf), "with a tendency to a calcaneus foot." Tr. 185. Plaintiff had weak toe flexors and extensor and a hammering deformity (condition in which there is permanent flexion at the midphalangeal joint of the toe) in his left big toe, with lesser hammertoes in the other toes. There was a generalized weakness in the entire function of plaintiff's left foot and ankle. Plaintiff's quadriceps (thigh muscles) and hamstrings were weaker in the left than the right leg. He had diminished sensation in his left leg. X-rays of plaintiff's thoracic and lumbar spine revealed the old compression fracture and lipping (formation of a lip-like structure) at the L1 level. Dr. Otto concluded that it was difficult to determine whether plaintiff's left leg neuropathy resulted from his spinal injury or cerebral hemorrhage. Dr. Otto stated
I do not think that this man could be rehabilitated with any type of treatment. I do not think that spinal fusion nor laminectomy would be of any use or avail at this time with this type of history. I think that he is completely disabled for employment and will remain such all of his lifetime. I have nothing special that I can offer him in treatment.
Tr. 186.
Plaintiff testified that he experiences a constant pain in his back, which radiates down his hip and left leg; that arthritis causes him to have more pain at the present then he did in 1972; and stated that he could tolerate his pain by laying down after being up for 1-2 hours. Plaintiff indicated that he wears a back brace when he leaves his house for any length of time. He could only walk a block or two before the pain in his back and legs cause him to stop. Plaintiff stated that he experiences pain and discomfort in his back from riding in a car. He could lift only 4-5 pounds and he cleans house for only five minutes at a time. Plaintiff stated that he takes pain medication, but that it does not completely alleviate the pain. Plaintiff testified that raising his arms above his head causes pain. *632 He also experiences severe headaches which last approximately 2-3 days. Plaintiff contended that when he gets a headache, he "go[es] straight to the hospital." Tr. 45. Plaintiff testified that sleep relieved his headaches. The arthritis affects his hands, back, hips, and ankles.
Arthur E. Smith, Ph.D., a vocational expert, also testified at plaintiff's hearing. Dr. Smith stated that plaintiff has a past work history of medium to heavy work and some semi-skilled work. Plaintiff's job as a desk clerk was sedentary to light work with transferrable skills. The ALJ asked Dr. Smith the following hypothetical question:
Now, I would like to have you assume as true that Mr. Earl Leroy Brissette, 40 years of age, 9th grade education, has done the jobs as he has elucidated today and in this exhibit; has the transferable skills that you have mentioned today, arising out of those jobs; that in 1970, he had an accident which caused a fracture of his back; in 1972, another accident superimposed upon the same injury;
That since that time, he has had pain in the lower part of his back, radiating into the left leg, sometimes into both legs, however, more so in the left leg; that the pain is constant and severe; that he can only be up an hour or 2 hours and must lie down in order to try to relieve the pain; that he does do some housework, some vacuuming from time to time; that if he tries to stay up over 4 or 5 hours, that he has fallen on 2 occasions;
That he also has 2 or 3 times a month severe headaches which incapacitate him for 2 or 3 days; that there is no day that goes by that he does not have pain in his back, and that he does not have to lay down during the day.
Now, if he has to do that, Doctor, lay down after one or 2 hours being up, is he employable?
Tr. 59-60. Dr. Smith answered that plaintiff would not be employable. The ALJ then posed the following hypothetical question to Dr. Smith:
Now, let us assume as to his age, education, but that his impairments  However, his impairments are not as severe they require that he lay down every day, that he can be up most of the day, do his housework or  That he can, has good eye/hand coordination; that his hands, he can lift and grasp up to 5 to 10 pounds on occasion; that he can sit most of the day; that he can walk a block or two and that he is not required to take copious amounts of pain medication to relieve the pain that he does experience; that he does have pain, however, it is not of such a nature that he is unable to concentrate, unable to cope with the pain, without taking strong drugs in order to relieve it; that one tablet a day or so a day is sufficient.
Tr. 60. Dr. Smith answered that plaintiff had the residual ability to engage in work of a sedentary or light nature. Dr. Smith indicated that if plaintiff could not lift over five pounds, the probability that he would be hired would be very slight. Dr. Smith stated that if plaintiff's description of his back pain were true, he would not be employable.
The ALJ found that plaintiff has significant impairments, but that there is no evidence that his impairments are completely disabling. The ALJ noted that plaintiff has not been hospitalized for his back since 1973 and that the problems for which plaintiff was hospitalized in 1977 have not recurred. The ALJ relied on the medical reports of Drs. McClure and Weis, who found that plaintiff has a back impairment, but that it does not prevent him from engaging in sedentary work activities. The ALJ noted that Dr. Otto believed that plaintiff was completely disabled, but found the reports of Drs. McClure and Weis to be more persuasive. The ALJ stated that there was nothing in Dr. Otto's report that made it superior to the reports of Drs. McClure and Weis. The ALJ also found that Dr. Otto's report was conclusory in that he had not specified the areas in which plaintiff was limited, whereas Drs. McClure and Weis had indicated the areas in which plaintiff was limited. The ALJ noted that none of the examining physicians had found plaintiff *633 to be in distress. "In addition, the evidence shows no hospitalizations for his back since 1973, no regular medical treatment for his back, no physical therapy for his back, and only light use of pain relievers." Tr. 16. The ALJ dismissed plaintiff's allegations of disabling pain as non-credible. The ALJ did not consider whether plaintiff was bothered by hemorrhoids because plaintiff submitted no medical evidence regarding the hemorrhoids. The ALJ found no medical evidence of widespread arthritis. The ALJ believed that plaintiff's headaches occurred too infrequently to be considered disabling. The ALJ noted that although plaintiff had testified that he goes to the hospital as soon as he gets a headache, "the medical evidence only shows four emergency room visits for headaches since 1977 when the claimant says they started." Id. The ALJ found that plaintiff's serious medical problems in 1977 and 1978 have not recurred.
The ALJ described plaintiff as a younger individual, with a high school education, and with a past work history of semi-skilled work which provided him with transferrable skills for sedentary work. The ALJ applied the Medical-Vocational Guidelines to find that plaintiff is not disabled. 20 CFR Part 404, Subpart P, Appendix 2, Rule 201.29. The ALJ stated that the vocational testimony established that there are a significant number of sedentary occupations for which plaintiff is capable of performing. The ALJ concluded that plaintiff's disability ceased in June, 1981, and that August, 1981, was the last month in which he was entitled to a period of disability and disability insurance benefits.
The Secretary's decision is conclusive upon this Court if it is supported by substantial evidence, i.e., relevant evidence a reasonable person might accept as adequately supporting the decision. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); 42 U.S.C. § 405(g). The issue before this Court is whether substantial evidence on the record supports the Secretary's determination that plaintiff failed to establish a right to a period of disability and the resultant benefits after August, 1981.
Plaintiff has the burden of proving his continuing disability by showing that his disability continued past June 1981. See Weber v. Harris, 640 F.2d 176, 177 (8th Cir.1981). The Secretary can terminate benefits if current evidence shows that either plaintiff has improved to the point where he can engage in substantial gainful activity or plaintiff's condition is not as serious as once believed. Id., at 178.
Plaintiff contends that the Secretary should be required to prove that plaintiff's condition has improved or changed so that plaintiff could engage in substantial gainful activity. Patti v. Schweiker, 669 F.2d 582 (9th Cir.1982); Simpson v. Schweiker, 691 F.2d 966 (11th Cir.1982). This Court agrees with plaintiff's contention that the Secretary must show that plaintiff has been capable of engaging in substantial gainful activity since June 1981 in order to terminate his benefits. This Court finds that the Secretary has sustained this burden.
Plaintiff alleges disability due to a back impairment(s). Back impairments are not per se disabilities. See, e.g., Roberts v. Schweiker, 682 F.2d 743 (8th Cir.1982) (back ailment was not disabling because it did not prevent claimant from engaging in substantial gainful activity); Keller v. Matthews, 543 F.2d 624 (8th Cir.1976) (per curiam) (although claimant had a back impairment, it did not preclude him from engaging in light or sedentary work); Gianella v. Califano, 477 F.Supp. 7 (E.D.Mo.1979) (medical evidence did not support plaintiff's complaints of low back pain).
Plaintiff cites Landess v. Weinberger, 490 F.2d 1187 (8th Cir.1974), in support of his argument that his back impairment is disabling. Landess held that the ALJ cannot evaluate disability without personal examination of the individual and that the ALJ must consider the disability as it relates to the particular claimant. In the present case, there is no evidence that the ALJ either improperly relied on the opinion of a physician who never examined plaintiff or *634 improperly viewed plaintiff's impairments as isolated from one another. Thus, Landess is not dispositive of the present case.
The medical evidence supports the ALJ's finding that plaintiff's back impairment(s) is not disabling. The record reveals that plaintiff has not been hospitalized for his back impairment since 1973. At that time, it was recommended by two physicians, Drs. Lottes and Kendig, that plaintiff be treated conservatively. Tr. 122-24. The record also indicates that Dr. Lottes last examined plaintiff on January 29, 1974, at which time plaintiff complained of back pain; but, Dr. Lottes concluded that plaintiff's disability was not as severe as plaintiff believed. Tr. 127. The report of Dr. Weis reveals that plaintiff has some difficulty with his low back and should avoid heavy lifting, prolonged ambulation, bending, stooping, climbing, or working at heights. Tr. 167. Dr. McClure found that plaintiff "is capable of a reasonable amount of standing, walking, stooping and bending and light lifting," but that it would be difficult for plaintiff to return to work after nine years of sitting. Tr. 171. The reports of Drs. Weis and McClure describe plaintiff's impairments and limitations, but do not indicate that plaintiff's impairments are such that he cannot engage in any substantial gainful activity.
There is, however, a conflicting medical opinion from Dr. Otto that plaintiff is completely disabled and will remain so the rest of his life. Tr. 186. It is the ALJ's prerogative to resolve this conflict in the medical evidence. Janka v. Secretary of HEW, 589 F.2d 365, 369 (8th Cir.1978); see also Davis v. Schweiker, 671 F.2d 1187, 1190 (8th Cir.1982). If a doctor's conclusions are not supported by objective medical evidence, the ALJ can accord whatever weight he deems warranted to the statements. Russell v. Secretary of HEW, 402 F.Supp. 613, 619 (E.D.Mo.1975), aff'd, 540 F.2d 353 (8th Cir.1976). Nonetheless, this Court cannot act as a rubber stamp for the Secretary's decision. Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir.1980). There must be substantial evidence on the record to support the Secretary's conclusion. Id. Plaintiff suggests that the ALJ did not state a sufficient reason for rejecting Dr. Otto's findings. The Court disagrees. Dr. Otto's report, as described by the ALJ, lacks a statement of specific limitations. Thus, it was reasonable for the ALJ to rely on the opinions of Drs. Weis and McClure because they had set forth the specific nature of plaintiff's limitations. Accordingly, there is substantial evidence on the record to support the ALJ's finding that plaintiff's back impairments are not disabling.
Plaintiff also alleges disability due to arthritis. The fact that plaintiff has arthritis does not, alone, establish a disability. See, e.g., Warner v. Schweiker, 551 F.Supp. 789, 792 (E.D.Mo.1982) citing Gilliam v. Califano, 472 F.Supp. 598 (E.D.Mo. 1979), rev'd on other grounds, 620 F.2d 691 (8th Cir.1980); Timmerman v. Weinberger, 375 F.Supp. 641 (E.D.Mo.1974), aff'd, 510 F.2d 439 (8th Cir.1975). Plaintiff contends that Dr. Weis's report establishes that his arthritis is disabling. Dr. Weis's report indicates that an x-ray of plaintiff's lumbar spine revealed degenerative arthritis of the thoracic and lumbar spine. Tr. 167. There is no medical evidence that plaintiff's arthritis limits his mobility or is disabling. Thus, the ALJ's determination that plaintiff is not disabled as a result of arthritis is supported by substantial evidence.
Plaintiff claims that his headaches preclude him from engaging in substantial gainful activity. In Yawitz v. Weinberger, 498 F.2d 956 (8th Cir.1974) (per curiam), the Eighth Circuit held that the claimant's migraine headaches were a medical impairment which precluded him from engaging in substantial gainful activity. Yawitz is distinguishable from the present case because in Yawitz, four physicians found that the claimant suffered from extremely severe headaches and that he had left over eight jobs because he could not perform reliably due to his headaches.
Plaintiff states that Drs. Beyer and Frawley and his four emergency room visits support his claim of disabling headaches. Dr. Frawley has stated that plaintiff suffers *635 from occasional severe headaches. Tr. 156. There is no evidence on the record that Dr. Frawley treated plaintiff for his headaches; in fact, Dr. Frawley referred plaintiff to Drs. Simowitz and Gold to treat plaintiff's neurological difficulties on a regular basis. Tr. 155. Dr. Beyer stated that plaintiff complained of headaches on the left side. Tr. 166. Dr. Beyer prescribed pain medication. Neither Dr. Beyer nor Dr. Frawley described plaintiff's headaches as severe enough to limit his ability to participate in substantial gainful activity.
The emergency room records reveal that plaintiff was examined for his complaints of headache and discharged with medication on March 12, 1979, May 20, 1981, July 3, 1981, and August 4, 1981. Tr. 157, 158, 159, 164. On July 3, 1981, it was suggested to plaintiff that he be admitted to the hospital for further evaluation, but plaintiff refused. The emergency room records do not indicate that plaintiff's headaches are of such a severe nature that he cannot engage in substantial gainful activity. The severe headaches appear to occur too infrequently to be disabling. Thus, substantial evidence supports the ALJ's finding that plaintiff's headaches do not preclude him from engaging in substantial gainful activity.
Plaintiff contends that his other problems, such as hemorrhoids, low platelet count, idiopathic thrombocytopenic purpura should be considered in combination with his other complaints. The ALJ must consider how plaintiff's impairments affect him as a whole. Landess, supra. Since there was no medical evidence relating to plaintiff's hemorrhoids, it was proper for the ALJ not to consider them. 20 CFR § 404.1508. Substantial evidence also supports the ALJ's finding that plaintiff's serious medical problems which occurred in 1977-1978 were resolved with treatment. Thus, the ALJ accorded appropriate weight to these other medical problems.
Plaintiff also alleges disability due to pain. Pain is considered disabling only when it is not remediable and precludes the plaintiff from engaging in substantial gainful activity. Gianella, supra. The Secretary must evaluate subjective complaints of pain "with due consideration for credibility, motivation and medical evidence of impairment." Timmerman, supra, 375 F.Supp. at 645. The Secretary, not the Court, assesses the credibility of the witnesses. Fitzsimmons v. Mathews, 647 F.2d 862, 864 (8th Cir.1981). Conclusions of credibility, made by the ALJ, are given considerable weight. See Easttam v. Secretary of HEW, 364 F.2d 509, 513 (8th Cir.1966). The ALJ's personal observation of plaintiff's appearance and demeanor during the hearing is an important consideration in assessing plaintiff's credibility. Halsted v. Harris, 489 F.Supp. 521, 526 (E.D.Mo.1980). The ALJ explicitly found that although plaintiff experiences some pain and discomfort, plaintiff's testimony regarding disabling pain was not credible. Unless the record indicates that this finding is not supported by substantial evidence, this Court should accept it. See Wilson v. Schweiker, 681 F.2d 526, 527 (8th Cir.1982). The ALJ did not require that the pain be supported by objective, medical evidence. See Northcutt v. Califano, 581 F.2d 164 (8th Cir.1978). Since there is nothing on the record which indicates that the ALJ's finding was inappropriate, this Court must defer to the ALJ's finding that plaintiff's complaints were not credible.
The ALJ applied the Medical-Vocational Guidelines of 20 CFR Part 404, Subpart P, Appendix 2, to find that plaintiff was not disabled. Recently, the Supreme Court upheld the use of the grid to determine a claimant's right to disability benefits. Heckler v. Campbell, ___ U.S. ___, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The ALJ properly found that plaintiff was a younger individual (20 CFR § 404.1563(b), younger person is defined as under age 50) with a high school education (20 CFR § 404.1564(b)(4)). The ALJ properly relied on testimony from the vocational expert to determine that plaintiff's previous work involved some semi-skilled work which provided plaintiff with skills transferrable to sedentary work. Tr. 57-59. The ALJ *636 found that plaintiff could perform sedentary work, which is defined as work involving
lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 CFR § 404.1567(a). The residual functional capacity to engage in sedentary work "is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir.1982) (citations omitted). The ALJ has the burden of establishing by medical evidence that plaintiff has the residual functional capacity to engage in sedentary types of employment. Id. The record reveals that the ALJ relied on the testimony of the vocational expert and the medical evidence to determine that plaintiff could engage in sedentary work. Tr. 59, 60-61, 167, 171. Thus, it was proper for the ALJ to find that plaintiff had the residual functional capacity to engage in sedentary work. Contra McGhee v. Harris, 683 F.2d 256, 260 n. 1 (8th Cir.1982) (it is improper for the ALJ "to determine that specific vocations exist for which the claimant is qualified based apparently entirely on his own evaluation of medical evidence and his own observation of the claimant). Applying plaintiff's residual functional capacity, age, education, and work experience to the grid reveals that plaintiff should be considered not disabled. 20 CFR Part 404, Subpart P, Appendix 2, Rule 201.29. Accordingly, substantial evidence on the record supports the ALJ's determination that plaintiff is not disabled.
The motion of the plaintiff for summary judgment will be overruled; the motion of the defendant for summary judgment will be sustained. An appropriate order will issue.